**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

METROPOLITAN ALLOYS CORPORATION,

        Plaintiff,

                                Case No. 06-12667
v.                                Hon. Gerald E. Rosen

CONSIDAR METAL MARKETING, INC.,

        Defendant.

_____/

**OPINION AND ORDER REGARDING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ April 30, 2009 _____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

By opinion and order dated September 25, 2007, the Court granted in part and

denied in part a motion to dismiss brought by Defendant Considar Metal Marketing, Inc.

In the wake of this ruling, Plaintiff Metropolitan Alloys Corporation filed a first amended

complaint on November 27, 2007, asserting state-law claims of fraud, breach of contract,

and promissory estoppel.  Each of these claims arises from Defendant's failure to perform

in accordance with an alleged oral commitment to supply Special High Grade ("SHG")

zinc at an agreed-upon premium over the average price of SHG zinc on the London Metal

Exchange.

With the discovery period having concluded, Defendant now renews its challenge to Plaintiff's claims in this case.  Specifically, by motion filed on December 1, 2008, Defendant seeks summary judgment in its favor on each of the three claims asserted in Plaintiff's first amended complaint, arguing (i) that Plaintiff's fraud claim lacks legal and factual support, (ii) that Plaintiff's breach of contract claim is barred by the statute of frauds, and (iii) that Plaintiff has failed as a matter of law to establish any of the three elements of a claim of promissory estoppel.  In a December 29, 2008 response to this motion, Plaintiff consents to the dismissal of its fraud claim, but contends that issues of fact remain as to the viability of its remaining claims.  Defendant then filed a January 12, 2009 reply in further support of its motion.

Having reviewed the parties' written submissions in support of and opposition to Defendant's motion, the accompanying exhibits, and the record as a whole, the Court finds that the pertinent facts and legal contentions are sufficiently presented in these materials, and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide Defendant's motion "on the briefs."  See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

The basic facts underlying the parties' dispute in this case are set forth in some detail in the Court's earlier opinion on Defendant's motion to dismiss, *see Metropolitan Alloys Corp. v. Considar Metal Marketing, Inc.,* No. 06-12667, 2007 WL 2874005 (E.D.

2

Mich. Sept. 25, 2007), and need not be recounted at length here.  Instead, the Court briefly summarizes these facts, and then addresses the deposition testimony of the principal witness for each party.

Plaintiff Metropolitan Alloys Corporation is a Michigan-based manufacturer of zinc-based alloys for customers which, in turn, use these metal alloys to make automobile components and other zinc-based metal products.  Defendant Considar Metal Marketing, Inc. is a Canadian corporation that markets and sells zinc and other metals, including the "Special High Grade" ("SHG") zinc that is the subject of the parties' dispute here.

The price of zinc fluctuates in accordance with the market price at which it is traded on the London Metal Exchange ("LME").  Zinc sellers, such as Defendant, sell at the LME price plus a premium, which reflects such factors as local market conditions, manufacturing and transportation costs, and ordinary supply and demand.

Plaintiff's claims in this case rest upon the assertion that Defendant's sales manager, Joanne Felkers, made a verbal commitment in April of 2005 that Defendant would supply Plaintiff with 200 to 400 metric tons of SHG zinc each month between January and September of 2006, at a premium of 3.5 cents per pound over the average LME price during a specified ten-week period prior to each quarter in which the parties engaged in these transactions.  According to Plaintiff, these quantity and pricing terms reflected a "request for quote" ("RFQ") issued by one of its customers, Fischercast Global Corporation.  Upon receiving a purported commitment from Defendant to supply the requested quantities of SHG zinc at the requested price, Plaintiff responded to

3

Fishercast's RFQ in late April of 2005, and was informed a short time later that its bid had been accepted.  In late July of 2005, however, Ms. Felkers called Plaintiff's president, Murray Spilman, and advised him that Defendant would not provide SHG zinc at the allegedly agreed-upon price.

As its principal factual support for these allegations, Plaintiff points to the deposition testimony of its president, Mr. Spilman.  Specifically, Mr. Spilman testified that he called Ms. Felkers on or around April 15, 2005 and informed her of the RFQ issued by Plaintiff's customer, Fishercast.  (*See* Defendant's Motion, Ex. 2, Spilman Dep. at 183-85.)  According to Mr. Spilman, Ms. Felkers responded that she and Defendant were familiar with this customer, and that Defendant would be willing to supply Plaintiff's requirements for this customer in the event that its bid was accepted.  (*See id.* at 185.)  Mr. Spilman further testified (i) that Ms. Felkers specifically offered, on behalf of Defendant, to supply between 200 and 400 metric tons of SHG zinc per month at Plaintiff's election, (ii) that he and Ms. Felkers agreed upon a 3.5-cent premium for these purchases, and (iii) that he accepted Ms. Felkers's offer on these points.  (*See id.* at 185-87.)[1]

According to Mr. Spilman, upon learning in mid-May of 2005 that Plaintiff was the successful bidder on the Fishercast contract, he promptly called Ms. Felkers and

---

[1]In light of this deposition testimony, the Court is at a loss as to how Defendant can tenably complain that Plaintiff has "mischaracterize[d]" or "misstate[d]" the record through its assertion that Mr. Spilman "accepted [Defendant's] offer" to supply the requirements of the Fishercast RFQ at a 3.5-cent premium.  (Defendant's Reply Br. at 2 n.1.)

informed her that Plaintiff had won the bid.  (*See id.* at 191.)  In response, Ms. Felkers told him that Defendant would "send us a contract."  (*Id.*)[2]  Shortly thereafter, Ms. Felkers advised Mr. Spilman that credit insurance would be needed in connection with the parties' proposed deal, and that Defendant's insurer would be in contact with Plaintiff to obtain the necessary information.  (*See id.* at 192.)  In early July of 2005, Ms. Felkers informed Mr. Spilman that "the credit was in place," and she once again promised that Defendant "would be preparing the contract" memorializing the parties' agreement.  (*Id.* at 196-97.)

When no such written document was forthcoming, Mr. Spilman repeatedly called Ms. Felkers in mid-July of 2005 to inquire about this matter.  Mr. Spilman eventually was able to reach Ms. Felkers during this period, and was told that Defendant "had a lot of contracts that they had to get out," that Defendant "would get to it as soon as possible," and that the contract should be forthcoming "soon."  (*Id.* at 197-98.)  On or around July 27, 2005, however, Ms. Felkers called Mr. Spilman and advised him that Defendant was not going to supply SHG zinc in accordance with the terms previously discussed by the parties.  (*See id.* at 199-200.)  According to Mr. Spilman, Ms. Felkers stated that she had been "overruled by Graham White," Defendant's sales director, and that there was "nothing she could do about it."  (*Id.* at 200-01.)[3]  Although Defendant subsequently

---

[2]Again, Defendant inexplicably protests that Plaintiff has mischaracterized this testimony by stating that Ms. Felkers "promised to send a contract."  (*See* Defendant's Reply Br. at 2 n.1.)

[3]Mr. Spilman testified that at no time in his prior discussions with Ms. Felkers did she advise him that she needed to obtain Mr. White's approval of the premium she had discussed and

agreed to provide a more limited quantity of SHG zinc during the first quarter of 2006, at the same 3.5-cent premium discussed by the parties and on a "[t]ake it or leave it" basis, (*id.* at 201), Plaintiff alleges in its complaint that it was forced to look to other suppliers and pay higher prices in order to meet the remainder of its obligations under the Fishercast contract.

In contrast to the testimony of Mr. Spilman on these points, Ms. Felkers's deposition testimony presents a somewhat (though not entirely) different view of the parties' interactions in the spring and summer of 2005.  First, Ms. Felkers confirmed at her deposition that Mr. Spilman contacted her on or around April 15, 2005 to obtain a quote on a "certain amount of zinc which I thought would be going to the Fisher[cast] bid." (Defendant's Motion, Ex. 6, Felkers Dep. at 29.)  She acknowledged that Mr. Spilman specifically referenced the Fishercast bid during this conversation, but noted that any zinc sold by Defendant to Plaintiff need not have been applied toward this bid and that Plaintiff "could have done other things with it."  (*Id.*)  Ms. Felkers further testified that because Mr. Spilman was interested in purchasing a "range" of quantities of zinc, rather than a fixed quantity each month, she "wouldn't have quoted him on any kind of range," but would have insisted upon a definite quantity.  (*Id.* at 29-31.)[4]  In addition, she

purportedly agreed upon in the course of their mid-April conversation.  (*See id.* at 198-99.)

[4]In particular, as Ms. Felkers explained at her deposition, (*see id.* at 29-33), and as Defendant discusses at greater length in the brief in support of its motion, (*see* Defendant's Motion, Br. in Support at 5), it is Defendant's usual policy to enter into a separate transaction with a "hedge partner" whenever it enters into an agreement to sell zinc in the future at a price set in advance of the purchase date.  This "hedging" protects against price fluctuations in the

questioned Mr. Spilman's assertion that they discussed a 3.5-cent premium, and instead opined that "we talked about 4 cents" as a premium.  (Felkers Dep. at 30.)  More generally, Ms. Felkers disputed Plaintiff's claim that the parties entered into any sort of an agreement in mid-April of 2005, and instead characterized her telephone call with Mr. Spilman as a preliminary conversation.  (*Id.* at 34-35.)

As noted by Plaintiff, Ms. Felkers's testimony is not entirely clear as to whether, or at what point, she advised Mr. Spilman that she needed the approval of her superiors in order to enter into an agreement on Defendant's behalf.  At one point during her deposition, Ms. Felkers testified that, if asked, she would have informed Mr. Spilman that "anything that we had agreed to or discussed would have to be confirmed by my boss," but she could not recall whether Mr. Spilman had raised any such questions about her authority.  (*Id.* at 36.)  Later, however, she testified that she expressly informed Mr. Spilman, during at least one of their conversations, that his request for a 3.5-cent premium would have to be approved by Defendant's sales director, Graham White.  (*See id.* at 40-41, 61.)  Ms. Felkers acknowledged, however, that she has the authority to sign contracts on Defendant's behalf,[5] and that nothing in these documents discloses any limits upon her

---

period between Defendant's execution of such an agreement and its subsequent sales in accordance with the terms of the agreement.  According to Defendant, the requisite "hedging" arrangement cannot be made unless Defendant and its customer have agreed upon a specific quantity to be sold.

[5]In fact, Plaintiff points out that Ms. Felkers signed the contract under which the parties agreed to a more limited sale of SHG zinc during the first quarter of 2006.  (*See* Plaintiff's Response, Ex. 4.)

authority to do so.  (*See* Felkers Dep. at 38-40.)

As to the parties' contacts in July of 2005, Ms. Felkers's account once again differs in some respects from Mr. Spilman's recollection of these conversations.  In particular, while Ms. Felkers recalled the conversation in which she informed Mr. Spilman that Defendant had secured the credit insurance that would permit the parties' proposed transaction to go forward, she insisted that "there was no deal at that time," and that the parties "were still negotiating [a] premium."  (*Id.* at 60.)  Ms. Felkers further testified that when Mr. Spilman expressed his desire in a mid-July telephone conversation to proceed with a 3.5-cent premium, she responded that she "would speak to my boss about whether that was something we wanted to do."  (*Id.* at 61-62.)  After Mr. White informed her that this premium was "too low," she advised Mr. Spilman that Defendant would not agree to this price term, but that her company would consent to a more limited sale of 125 metric tons of zinc at a 3.5-cent premium during each of the first three months of 2006.  (*Id.* at 62-67; *see also* Plaintiff's Response, Ex. 4 (contract memorializing this more limited sale).)

Dissatisfied with this outcome, Plaintiff commenced the present action in this Court on June 16, 2006, seeking to recover the additional expenses and other costs it incurred in obtaining substitute supplies of SHG zinc to meet its obligations to Fishercast. Following the Court's resolution of Defendant's motion to dismiss, Plaintiff filed a first amended complaint in which it has asserted state-law claims of fraud, breach of contract, and promissory estoppel.  Upon the conclusion of a full period of discovery, Defendant

now seeks summary judgment in its favor on each of these claims.[6]

## III.  ANALYSIS

**A.    The Standards Governing Defendant's Motion**

Through the present motion, Defendant seeks summary judgment in its favor on each of Plaintiff's three state-law claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The governing standard is somewhat different where, as here, the moving party bears the burden of proof as to one of the issues raised in its motion.  Specifically, Defendant's challenge to Plaintiff's breach of contract claim rests upon the statute of frauds, an affirmative defense upon which Defendant bears the burden of proof.  *See TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 547 (6th Cir. 1981); *Dresser v. Cradle of Hope Adoption Center, Inc.,* 358 F. Supp.2d 620, 631 (E.D. Mich. 2005).  To secure an

---

[6]As noted earlier, Plaintiff does not oppose the dismissal of its fraud claim, leaving only its breach of contract and promissory estoppel claims to be addressed in the present opinion.

award of summary judgment in its favor on this affirmative defense, Defendant's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted); *see also Dresser,* 358 F. Supp.2d at 631.

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). Finally, as to Defendant's appeal to the statute of frauds, "summary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Arnett v. Myers,* 281 F.3d 552, 561 (6th Cir. 2002) (internal quotation marks, citation, and alterations omitted). The Court will apply these standards in resolving Defendant's motion.

**B.     Issues of Fact Remain as to Whether Plaintiff's Breach of Contract Claim Is Barred by the Statute of Frauds.**

As noted above, Plaintiff's claims in this case rest upon a verbal commitment

10

purportedly made by Defendant's sales manager, Joanne Felkers, that Defendant would supply Plaintiff's SHG zinc requirements under its Fishercast contract at a price reflecting the LME market price plus a 3.5-cent premium. Plaintiff acknowledges that the terms of this alleged agreement are not set forth in any writing signed by Defendant. Citing this absence of a written agreement, Defendant argued in its initial motion to dismiss that Plaintiff's breach of contract claim was barred by the statute of frauds, but the Court found that Plaintiff's allegations were sufficient to establish an estoppel-based exception to the usual requirement of a written agreement. Defendant now renews its statute of frauds challenge, arguing that Plaintiff's appeal to principles of estoppel would, at best, entitle it to proceed under a theory of promissory estoppel, and not under a breach of contract theory. The Court rejects this contention, on much the same grounds identified in its earlier ruling on Defendant's motion to dismiss.

As a proposed sale of goods, the parties' alleged agreement in this case would be governed by Michigan's enactment of the Uniform Commercial Code ("UCC").[7] Under § 2-201 of the UCC, "a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Mich. Comp. Laws § 440.2201(1). In this case, there is no question that the transaction at issue was for an amount far in excess of $1,000, and

---

[7]As was the case in the briefing on Defendant's earlier motion to dismiss, the parties once again agree that Michigan law governs their dispute.

11

Plaintiff does not claim that the terms of this transaction were ever memorialized in any writing signed by Defendant.  Accordingly, the UCC's statute of frauds would bar Plaintiff's breach of contract claim here, absent some legally valid and factually supported basis for relaxing the usual statutory requirement of a writing signed by Defendant.[8]

Yet, as discussed in the Court's September 25, 2007 opinion, principles of estoppel provide one potential avenue for Plaintiff to overcome a statute of frauds defense.  In particular, the Court noted the decision of the Michigan Court of Appeals in *Fairway Machinery Sales Co. v. Continental Motors Corp.,* 40 Mich. App. 270, 198 N.W.2d 757, 758 (1972), in which the defendant interposed a UCC statute of frauds defense and the plaintiff responded by "plead[ing] an estoppel which might prevent defendant from asserting the defense of statute of frauds."  In remanding the case for trial, the Court of Appeals cited the existence of "genuine issues" as to a number of "material facts" bearing upon the plaintiff's appeal to principles of estoppel, including whether the defendant had made statements "constitut[ing] an acceptance of the [plaintiff's] bid and a promise to confirm this bid in writing."  *Fairway Machinery Sales,* 198 N.W.2d at 758.

As explained in the Court's earlier ruling, this Michigan appellate decision, if

_____

[8]As Defendant points out, apart from the UCC's statute of frauds, Michigan law more generally requires a writing signed "by the party to be charged with the agreement, contract, or promise" where, as here, the parties' alleged agreement, "by its terms, is not to be performed within 1 year from the making of the agreement."  Mich. Comp. Laws § 566.132(1)(a).  The alleged agreement in this case was reached in April of 2005, but contemplated sales extending through September of 2006.

followed here, would permit Plaintiff to avoid the bar of the UCC's statute of frauds. Plaintiff here, like the plaintiff in *Fairway Machinery Sales,* allegedly was assured that Defendant would provide written confirmation of its purported verbal commitment to supply SHG zinc under the terms discussed by the parties' representatives, but this written confirmation was never forthcoming.  Moreover, Plaintiff has now produced evidence in support of its estoppel-based response to Defendant's statute of frauds defense — namely, the testimony of its president, Mr. Spilman, that Defendant's sales manager, Joanne Felkers, promised on more than one occasion to prepare and provide a written contract memorializing the parties' oral agreement.  Under this record, then, Plaintiff seemingly has produced sufficient evidence from which a trier of fact could conclude that it has established the form of estoppel recognized by the Michigan Court of Appeals in *Fairway Machinery Sales.*

Against this backdrop of Michigan law and this Court's prior decision in this very case, it presumably would behoove Defendant to suggest a legal or evidentiary basis for the Court to deviate from its earlier ruling on this point.  Yet, Defendant does not even attempt such an argument in the brief in support of its present motion.  Instead, Defendant contends that by virtue of Plaintiff's appeal to principles of estoppel, Plaintiff's breach of contract claim should be "recharacterized" as a promissory estoppel claim — and, therefore, merged with the claim of promissory estoppel that Plaintiff already has expressly asserted in count III of its first amended complaint.  As a threshold matter, however, there is no hint in the decision relied upon by Plaintiff and the Court, *Fairway*

13

*Machinery Sales,* that the court in that case "converted" or "recharacterized" the plaintiff's breach of contract claim into a claim of promissory estoppel.  Rather, the court explained that the plaintiff's invocation of principles of estoppel served the more limited purpose of "prevent[ing] defendant from asserting the defense of statute of frauds." *Fairway Machinery Sales,* 198 N.W.2d at 758.  As explained in the ruling on Defendant's motion to dismiss, this Court is obliged to follow the rulings of the Michigan Court of Appeals on matters of Michigan law "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise," *Ziebart International Corp. v. CNA Insurance Cos.,* 78 F.3d 245, 250-51 (6th Cir. 1996) (internal quotation marks and citations omitted), and Defendant has made no effort to dissuade this Court from adhering to the decision in *Fairway Machinery Sales.*[9]

More importantly, the decision of the Michigan Court of Appeals in that case rests upon the well-recognized distinction — a distinction completely overlooked in Defendant's present motion — between using estoppel as an "equitable shield" and invoking principles of estoppel "offensive[ly]" as a basis for a recovery "in the absence of a contract."  David J. Gass, *Michigan's UCC Statute of Frauds and Promissory Estoppel,*

---

[9]Against this backdrop, it is ironic that Defendant would chide Plaintiff for "fail[ing] to address" the argument that Plaintiff's breach of contract claim has been "transform[ed]" into a claim of promissory estoppel by virtue of Plaintiff's invocation of principles of estoppel. (Defendant's Reply Br. at 3.)  As Plaintiff correctly observes in its response to Defendant's present motion, (*see* Plaintiff's Response Br. at 7), essentially the same matter already had been addressed in Plaintiff's response to Defendant's earlier motion to dismiss, as well as in the Court's ruling on this earlier motion, and yet Defendant has made no effort in the present motion to suggest why a different result might now be warranted.

74 Mich. B.J. 524, 525-26 (1995).  In this case, Plaintiff is using principles of estoppel both defensively — to overcome Defendant's statute of frauds defense — and offensively — through a separate claim of promissory estoppel that provides an alternative avenue of recovery in the event that Plaintiff's breach of contract claim fails for lack of an enforceable contract.  These separate appeals to principles of estoppel rest upon two entirely distinct promises:  (i) the underlying verbal commitment to sell SHG zinc, which forms the basis for Plaintiff's claim of promissory estoppel, and (ii) the promise to reduce this commitment to writing, which forms the basis for Plaintiff's defensive use of estoppel to overcome Defendant's statute of frauds defense.  Under these circumstances, there is simply no basis for "converting" or "recharacterizing" Plaintiff's defensive use of estoppel into an affirmative claim of promissory estoppel.[10]

The Michigan courts have recognized and permitted this defensive use of estoppel to overcome a statute of frauds defense, without insisting upon the "conversion" of an underlying breach of contract claim into a claim of promissory estoppel.  Apart from the ruling in *Fairway Machinery Sales,* the Michigan Court of Appeals held in a more recent case that the statute of frauds did not apply because the "plaintiff was equitably estopped from denying the validity of" the parties' oral agreement, in light of the evidence that,

_____

[10]Similarly, there is no basis for Defendant's complaint that Plaintiff failed to properly "plead" the defensive form of estoppel that would permit it to overcome a statute of frauds defense.  (*See* Defendant's Reply Br. at 3.)  Plaintiff was under no obligation to anticipate and plead around this affirmative defense.  *See Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004).  In any event, Defendant can hardly claim any prejudice or unfair surprise, where this defensive form of estoppel was addressed by the parties and the Court alike at the very outset of this case, in the context of Defendant's motion to dismiss.

15

through "words and actions," the plaintiff had "induced defendant to believe that it had assented to" this oral agreement. *Kelly-Stehney & Associates, Inc. v. MacDonald's Industrial Products, Inc.,* 254 Mich. App. 608, 658 N.W.2d 494, 498, 500 (2003), *vacated on other grounds,* 469 Mich. 1046, 677 N.W.2d 838 (2004). Similarly, in *Oxley v. Ralston Purina Co.,* 349 F.2d 328, 331-336 (6th Cir. 1965) — the case upon which the Michigan Court of Appeals chiefly relied in *Fairway Machinery Sales* — the Sixth Circuit extensively surveyed the decisions of Michigan and other courts, and concluded that the Michigan courts would permit the defensive use of the doctrine of equitable estoppel to overcome a statute of frauds defense to a breach of contract claim.

More generally, in *Opdyke Investment Co. v. Norris Grain Co.,* 413 Mich. 354, 320 N.W.2d 836, 840 (1982), the Michigan Supreme Court explained that "estoppel and promissory estoppel have developed to avoid the arbitrary and unjust results required by an overly mechanistic application of" the statute of frauds. Nothing in this language, or elsewhere in this decision, reflects the Court's belief that these two forms of estoppel are one and the same, or that an appeal to principles of estoppel necessarily "converts" a breach of contract claim to a claim of promissory estoppel. To the contrary, in that very case, the Court first addressed the plaintiff's breach of contract claim, along with the defendant's statute of frauds defense, and then separately determined that the plaintiff had also stated a viable claim of promissory estoppel which, because of its reliance on a "noncontractual promise," necessarily fell "outside the scope of the statute of frauds." *Opdyke,* 320 N.W.2d at 842.

16

The cases cited by Defendant do not warrant a different conclusion.  In two of these cases, the courts made no effort to distinguish between the defensive use of principles of estoppel and an affirmative claim of promissory estoppel.  *See Clark v. Coats & Suits Unlimited,* 135 Mich. App. 87, 352 N.W.2d 349, 354 (1984); *Schipani v. Ford Motor Co.,* 102 Mich. App. 606, 302 N.W.2d 307, 310 (1981).  In any event, there was no need in either of these cases — or in the third case cited by Defendant, *Niles Industrial Services, Inc. v. AlliedSignal, Inc.,* No. 1:92:CV:600 (W.D. Mich. Jan. 13, 1994) (attached as Exhibit 28 to Defendant's motion) — to distinguish between these two forms of estoppel, because the promises upon which the plaintiffs relied to overcome a statute of frauds defense were precisely the same as the promises presented as grounds for their separate claims of promissory estoppel.  *See Clark,* 352 N.W.2d at 354-55; *Schipani,* 302 N.W.2d at 310-11.  Here, in contrast, Plaintiff's defensive invocation of principles of estoppel rests upon a separate promise — namely, that Defendant would provide a written contract memorializing the parties' oral agreement.  It is this separate promise upon which Plaintiff relies to equitably estop Defendant from asserting a statute of frauds defense, and *Fairway Machinery Sales* expressly permits the defensive use of estoppel under precisely these circumstances.

To be sure, the courts — both in Michigan and elsewhere — have expressed some reservations about using principles of estoppel to carve out judge-made exceptions to the statute of frauds.  In *Kelly-Stehney,* 658 N.W.2d at 499, for example, the Michigan Court of Appeals "question[ed] the wisdom of such judicially created exceptions to the statute

17

of frauds as equitable estoppel, ratification, and part performance," and expressed a preference for "deferring to the Legislature to address through the legislative amendment process any perceived inequity in the statute of frauds."[11]  Similarly, in *Consolidation Services, Inc. v. Keybank National Association,* 185 F.3d 817, 822-23 (7th Cir. 1999), the Seventh Circuit observed that "it would be bootstrapping" to allow proof of an oral promise to reduce an oral agreement to writing "to take [the underlying oral agreement] out of the statute of frauds," and opined that "the better view" is that such a promise "is unenforceable."  If this Court were writing on a blank slate, it might well share in this reluctance to permit oral statements to overcome the legislative command that certain agreements are not enforceable unless set forth in writing.

Yet, as evidenced by the above-cited rulings of the Michigan courts — and, in particular, the decision in *Fairway Machinery Sales* — this Court is ***not*** writing on a blank slate as to this issue.  Rather, this case law illustrates the continued willingness of the Michigan courts to apply principles of estoppel to overcome a statute of frauds defense.  Defendant has failed to identify any basis to depart from these precedents, and Plaintiff has produced sufficient evidence to raise genuine issues of material fact as to the availability of the defensive form of estoppel in this case.  Accordingly, Defendant is not entitled to summary judgment in its favor on its statute of frauds defense to Plaintiff's

---

[11]As Plaintiff points out, an equitable estoppel exception to the UCC's statute of frauds could be viewed as legislatively approved, rather than wholly judge-made, where § 1-103 of the UCC expressly permits the use of "principles of law and equity," including "estoppel," as a "supplement" to the UCC's provisions "[u]nless displaced by the particular provisions of this act."  Mich. Comp. Laws § 440.1103.

18

breach of contract claim.

**C.    Plaintiff Has Identified a Sufficient Evidentiary Basis for Its Claim of Promissory Estoppel.**

As the final challenge advanced in its motion, Defendant contends that Plaintiff has failed to produce sufficient evidence to establish any of the three elements of a claim of promissory estoppel. The Court cannot agree.

To establish a claim of promissory estoppel under Michigan law, Plaintiff must show (i) a promise, (ii) that Defendant "should reasonably have expected to induce action of a definite and substantial character" on Plaintiff's part, and (iii) that "in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v. Nationwide Mutual Insurance Co.,* 235 Mich. App. 675, 599 N.W.2d 546, 552 (1999). In challenging Plaintiff's showing as to the first of these elements, Defendant contends that the verbal commitment purportedly made by its sales manager, Ms. Felkers, was not sufficiently "definite and clear" to sustain a claim of promissory estoppel, *see State Bank of Standish v. Curry,* 190 Mich. App. 616, 476 N.W.2d 635, 637 (1991), where "the quantity of zinc to be supplied was yet to be determined and the pricing formula that [Plaintiff] alleges was promised required hedging." (Defendant's Motion, Br. in Support at 29.) Yet, while Plaintiff specified a range of 200 to 400 metric tons of SHG zinc that it wished to purchase each month, rather than a fixed monthly quantity, it can hardly be argued that this range alone rendered the alleged promise fatally indefinite or the promised quantity "yet to be

19

determined," particularly where Ms. Felkers acknowledged her awareness that Defendant was being asked to meet Plaintiff's requirements under the Fishercast RFQ.  Moreover, even assuming that Defendant's internal policies called for hedging under the circumstances of the transaction discussed by the parties, Plaintiff's president, Mr. Spilman has testified that Ms. Felkers's verbal commitment was unconditional,[12] and did not turn upon Defendant's ability to satisfy any prerequisites such as hedging, credit insurance, or the like.[13]

Turning to the second element of a claim of promissory estoppel, Defendant argues that it could not have anticipated Plaintiff's purported reliance on Ms. Felkers's alleged verbal commitment, in light of the standard practice of both parties to reduce their agreements to writing.  Yet, any uncertainty introduced by the failure to immediately

---

[12]The Court does not share Defendant's view, as stated in its reply brief, that Mr. Spilman's testimony on this point was "equivocal."  (Defendant's Reply Br. at 4.)  Rather, he expressly affirmed (i) Ms. Felker's specific statement of Defendant's willingness to supply the 200-400 tons of SHG zinc per month required under the Fishercast RFQ, and (ii) her offer of pricing at a 3.5-cent premium, which he accepted.  (Spilman Dep. at 185-87.)

[13]Ms. Felkers's testimony on this subject is not necessarily to the contrary.  She did not claim, for example, that she ever told Mr. Spilman that she could not make a firm commitment until Defendant first made the necessary hedging arrangements.  Indeed, nothing in the record suggests that Defendant's hedging policy would have posed a particular obstacle to this (or any other) deal.  Rather, Ms. Felkers testified only that she "wouldn't have quoted [Plaintiff] on any kind of [quantity] range," in light of Defendant's policy that the transaction proposed by Plaintiff would "ha[ve] to be hedged and to do that, you need a firm quantity."  (Felkers Dep. at 30.)  Mr. Spilman has testified, of course, that Ms. Felkers *did* quote a price for the quantity range sought by Plaintiff, and this disputed question must be left for the trier of fact to resolve.  In any event, Ms. Felkers's testimony is a bit inconsistent on this point, as she stated later at her deposition that she resisted Mr. Spilman's request for a 3.5-cent premium, and instead told him that a 4-cent premium would be appropriate.  (*See id.* at 33.)  Evidently, then, she was not altogether unwilling to discuss pricing, despite Plaintiff's desire for quantities of SHG zinc that might vary from month to month, and despite the need to hedge this proposed transaction.

memorialize Defendant's commitment in writing surely was mitigated by Ms. Felkers's **express promise, on more than one occasion** — at least according to Plaintiff, through the testimony of Mr. Spilman — that such a written contract would be forthcoming. These repeated assurances, if credited by the trier of fact, surely would signal Defendant's awareness that Plaintiff believed the parties had reached an agreement and was acting accordingly.  Indeed, one such assurance, according to Mr. Spilman, came in direct response to Mr. Spilman's call to Ms. Felkers informing her that Plaintiff's bid for the Fishercast business had been accepted.  Accepting this testimony as true, it suggests Ms. Felkers's understanding that the parties had reached an agreement which needed only to be memorialized in writing, as opposed to her belief that further negotiations were necessary in light of Plaintiff's successful Fishercast bid.  Moreover, Ms. Felkers testified to her own view that, once she has negotiated with a customer and reached an agreement on the terms of a transaction, she considers this a "verbal agreement" and a contract even before it is reduced to writing.  (Felkers Dep. at 101-03.)  Defendant can hardly claim surprise that Plaintiff might share this view.

Finally, Defendant contends that any reliance on Ms. Felkers's alleged verbal commitment would not have been reasonable, where this assurance purportedly was contingent upon various future developments — including Plaintiff's successful bid on the Fishercast business, Defendant's procurement of credit insurance, and the need to make appropriate arrangements for hedging — and where Mr. Spilman purportedly acknowledged at his deposition that any deal is "tentative" until it is reduced to writing.

21

(*See* Defendant's Motion, Br. in Support at 32.)[14]  The Court already has addressed

Defendant's claim as to the purportedly "conditional" nature of Ms. Felkers's alleged

verbal commitment, and need not repeat this discussion here.[15]  It bears emphasis,

however, that as these purported conditions were met — *i.e.,* once Plaintiff's Fishercast

bid was successful and Defendant had secured credit insurance — Mr. Spilman has

testified that Ms. Felkers did not back away from her commitment or pursue further

negotiations, but instead renewed her promise that a written contract would be

forthcoming.  Similarly, to the extent that Mr. Spilman acknowledged at his deposition

that it is sometimes necessary to "reconfirm" a supplier's pricing to account for possible

market fluctuations while Plaintiff is negotiating a deal with one of its customers, (*see*

Spilman Dep. at 206-07), his testimony indicates that Ms. Felkers provided any such

---

[14]Once again, the Court observes that Defendant's proposed reading of this deposition testimony is questionable.  In the passage quoted in Defendant's brief, (*see id.*), Mr. Spilman opines that a contract exists once the parties "come to a meeting of the minds," without in any way indicating that this "meeting of the minds" must be reduced to writing to be legally enforceable.

[15]The Court notes that a good deal of the factual account in Defendant's brief in support of its summary judgment motion is devoted to a discussion of Defendant's internal policies and practices on such matters as hedging, credit insurance, and the like.  Plainly, however, such internal practices cannot bear upon the reasonableness of Plaintiff's reliance unless Plaintiff was made aware of these practices and their impact upon the verbal commitment allegedly made by Ms. Felkers.  While Defendant has cited portions of Mr. Spilman's testimony as establishing his awareness of at least some of these practices — *e.g.,* his general familiarity with hedging, (*see* Spilman Dep. at 186-87) — Defendant has not identified anything in this testimony, or elsewhere in the record, that forges any link between these practices and the specific commitment allegedly made by Ms. Felkers to Mr. Spilman, such that Mr. Spilman's reliance on this assurance could be deemed as a matter of law to be unreasonable.  Rather, it must be left for the trier of fact to decide whether Mr. Spilman's reliance could not have been reasonable, in light of his knowledge of how transactions are negotiated and finalized by Defendant and by suppliers generally.

22

necessary confirmation once he informed her that Plaintiff had been awarded the Fishercast business.  A trier of fact could conclude that this alleged assurance provided a basis for Plaintiff's reasonable reliance, even if any reliance prior to this point might not have been reasonable.

### IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's December 1,

2008 motion for summary judgment (docket #44) is GRANTED IN PART, as to

Plaintiff's claim of fraud, and is otherwise DENIED.


<div style="margin-left:2em">

s/Gerald E. Rosen           

Chief Judge, United States District Court

</div>

Dated:  April 30, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record
on April 30, 2009, by electronic and/or ordinary mail.

<div style="margin-left:2em">

s/Ruth Brissaud      

Case Manager

</div>